UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15-cr-18-TRM-SKL |
| | ) | |
| MICHAEL SIBERT, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT & RECOMMENDATION**

Before the Court is a motion to suppress evidence filed by Defendant Michael Sibert ("Defendant") [Doc. 130]. The crux of Defendant's claim is that law enforcement improperly executed a search warrant when they searched his separate living quarters in violation of the Fourth Amendment. Plaintiff United States of America ("the Government") has filed a response in opposition to the motion [Doc. 139]. An evidentiary hearing on the motion was held on June 30, 2016.[1] At the request of the parties, post-hearing briefs were allowed and subsequently filed [Docs. 163 and 166]. After fully considering the evidence and arguments, I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

**I.      BACKGROUND**

Defendant and several codefendants are charged in a five-count indictment with conspiring to distribute 100 kilograms or more of a mixture and substance containing marijuana and with using the United States mail to facilitate the marijuana conspiracy [Doc. 3]. Defendant

---

[1] The motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b) by standing order.

seeks to suppress all evidence seized from his bedroom during the execution of a search warrant that authorized the search of the person of his half-brother and nonparty, Sean Blanton ("Sean"), and Sean's residence located at East Lauderdale Street in Tullahoma Tennessee. Defendant contends the execution of the search warrant should have been limited to areas of the residence that were rented or used by Sean and that the police unlawfully extended the search to Defendant's separately rented rooms.

During the evidentiary hearing, the government presented the testimony of U.S. Postal Inspector Jedidiah Hutchison ("Hutchison") and City of Tullahoma Police Department Patrol Officer Thomas Elliott ("Elliott"). Defendant testified on his own behalf and called his mother, Lola Sibert-Blanton ("Sibert-Blanton"), his half-brother Daniel ("Daniel"), and his neighbor, Gary Franklin ("Franklin") as defense witnesses. While the parties' versions of events differed in some respects, much of the relevant testimony was undisputed. Only the disputes significant to the issues at hand are specifically addressed herein.

Beginning July 27, 2015, Hutchison sought and obtained four federal search warrants for packages addressed to four different homes in the Tullahoma area from Eureka, California. Upon executing the warrants, each package was found to contain approximately two pounds of marijuana. One such package was addressed to Sean at his East Lauderdale Street residence. Hutchison informed Elliott of his investigation and they worked together to make a controlled delivery of two of the packages, including the package addressed to Sean.

As part of the preparation to deliver the package to Sean, Hutchison and Elliott determined Sean, Defendant, and others lived in a single family home at the East Lauderdale Street address. Because Elliott knew Defendant had a history of marijuana trafficking, Elliott pulled Defendant's photograph from his driver's license and Hutchison reviewed the photograph

of Defendant prior to the package delivery to the East Lauderdale Street residence. The police did not seek an anticipatory warrant; instead, they pre-prepared an application for a search warrant and a warrant for presentation to a Coffee County Judicial Commissioner in anticipation of a successful delivery of the package. Elliott was waiting at the Commissioner's office to present the application and obtain a warrant for a search of Sean's residence upon receipt of information from Hutchinson about successful delivery of the package. Although the police knew several people lived in the residence, including Defendant, the application and warrant identify only Sean by name and describe the structure at the address as a two-story residence.[2]

On July 29, 2015, Hutchison approached the house to attempt an undercover delivery of that package to Sean at the East Lauderdale residence. He saw no indication from the exterior of the house that there were two separate apartments or dwellings within the residence. The postal address did not indicate two separate units and there was only one mailbox and one front door.

Hutchison, who dressed as a postal worker for the controlled delivery, walked onto the porch and repeatedly knocked on the front door to deliver the package to Sean, but no one answered his knock. As Hutchison began to prepare a notice of attempted delivery, Daniel left the house next door where he lives and approached Hutchison at the door of the East Lauderdale residence. Hutchison said he had a package for Sean. Daniel responded that he knew someone

---

[2] The parties introduced no exhibits during the hearing. While not made an exhibit during the hearing, the authenticity of the application and warrant attached to the government's brief does not appear to be in dispute. The warrant describes the property to be searched as "the person of said **Sean Blanton** and in the premises used and occupied by him . . . located at [redacted] East Lauderdale Street, Tullahoma, TN. This will be a two-story residence with yellow siding and white trim. This house number [redacted] will be clearly marked to the right of the front door of residence. This is the premises to be searched including all buildings, out-houses and vehicles found thereof . . ." [Doc. 139-1].

3

was home because of the cars in the driveway and he went into the house to let someone inside know about the package for Sean.

The parties dispute what happened next. Hutchison testified that when Daniel opened the door he saw Defendant, who Hutchison recognized from the driver's license photograph, standing just inside the door. Daniel said to Defendant that the mail carrier had a package and Defendant responded by telling Daniel to sign for the package. According to Hutchison, Daniel then did so, and he heard Defendant say the package likely contained some kind of "parts." All the while, Defendant appeared to be trying to hide his face from Hutchison.

Contrarily, Defendant, Sibert-Blanton, and/or Daniel testified that Hutchison could not possibly see into the house from where he was standing outside the front door because the door was merely ajar--not wide open. They said Daniel did not speak to Defendant about the package at all, but instead spoke to Sibert-Blanton. She told Daniel to just sign for the package. Defendant stated he was able to see the postman on a security monitor in his bedroom and that he headed downstairs when he saw Daniel enter the house and heard his mother tell Daniel to sign for the package.

Although the parties dispute who told Daniel to sign for the package addressed to Sean, they agree that Daniel signed for the package. After the package was signed for and accepted by Daniel, Hutchison left the residence[3] and called Elliott and told him about the encounter, including that he had seen Defendant in the house. Elliott then presented the previously prepared search warrant application for the search at issue (along with a warrant application for another house to which one of the other four suspicious packages was to be delivered) to the Judicial Commissioner who issued the search warrant at issue. After the warrant was issued, Elliott

---

[3] Hutchison did not return to the home and offered no testimony about post-package delivery events.

4

communicated with police officers who were conducting surveillance at the house. Elliott told those officers that he had obtained the search warrant and they could secure the house. As a result, the officers at the house began the process of removing and detaining the occupants of the East Lauderdale Street residence.[4]

When Elliott arrived at the East Lauderdale Street house to deliver the executed search warrant, he noticed that Defendant and other occupants of the residence had already been detained outside the house. Elliott delivered the warrant and stayed about 20 minutes, but then left to deliver the other warrant obtained with respect to the attempted delivery of the second package. When he returned to the East Lauderdale Street residence some time later, several other police officers had already searched the entire house, including Defendant's bedroom on the second floor where the evidence at issue was found.[5]

Defendant testified that on the day at issue he and his mother were on the second floor of the residence when the police "swarmed" the house. As an officer walked up the stairway to the second floor of the residence, Sibert-Blanton came out of her bedroom and Defendant, who was "half-dressed" came out of his room. The unidentified officer told Defendant and his mother to go outside with the rest of the occupants.

Sibert-Blanton and Defendant both testified that before the execution of the warrant began, Sibert-Blanton asked why the police were inside her house. Specifically, Sibert-Blanton testified:

> Defendant's counsel: Okay. And how did you first become aware that the police were there?

---

[4] Daniel testified the officers also detained him at gunpoint at his separate residence next door.

[5] Items found in Defendant's room allegedly include a pistol, drug paraphernalia, a receipt book, notebook ledgers, and cellular telephones.

5

| | |
|---|---|
| Sibert-Blanton: | [After describing that she came out of her bedroom and took two or three steps down the stairs and met an officer coming up] And when I saw him, I said, who are you and why are you in my house. |
| Defendant's counsel: | Okay. |
| Sibert-Blanton: | And he asked me, are you the homeowner. And I said, yes, I am. And he said who else is in the upstairs with you. And I said Michael, Brittany and the kids are up here. They live up here in this area. This is the area they rent. |
| Defendant's counsel: | Okay. |
| Sibert-Blanton: | He said I need you to go downstairs right now. And I went downstairs. And I kept, I said what are you doing here, why are you in my house. |
| Defendant's counsel: | Okay: |
| Sibert-Blanton: | And another officer said, we have a search warrant for Sean Blanton. And I said, well, Sean Blanton's room is right there. That's where he lives. That's the room he rents. |
| Defendant's counsel: | Okay. |
| Sibert-Blanton: | And then they took me to the front porch. |

[Doc. 156 at Page ID # 721-22].

Defendant testified he went downstairs as ordered by the police without incident. Defendant did not say anything about his bedroom or living space being separate to the police. Defendant testified that he remained silent because he heard his mother telling the police about the rented rooms. Defendant did not lock the door to his room as his keys were left in the room and he was ordered downstairs.

6

Defendant testified that he had lived in his mother's house for about two years. Defendant said he began paying rent after his mother had issues with his brothers not working and she required them to either pay rent or move out. Defendant rented two upstairs bedrooms and a bathroom from his mother for $100.00 per month and his brothers Sean and Ryan Blanton each rented a downstairs bedroom from his mother. He described that his mother had required the adult children in her house to pay rent and that he had been paying rent for three-to-four months. He also described her house as being like a "boarding house."

All parties agree the police never sought consent to search any part of the house. Elliott testified that when he returned to the residence, an officer took him upstairs to see the evidence they had already located in Defendant's bedroom. Elliott testified that he also saw no door or other partition between the first and second floors or any other indication that there were separate apartments or units within the house. Elliott saw no padlock or other visible lock on the outside of Defendant's bedroom door. Elliott, who did not search the house, said he only saw one bathroom on the second floor of the house.

Sibert-Blanton testified her home has six bedrooms; three bedrooms are upstairs. Defendant and his mother both testified there were two bathrooms on the second floor, not one. Sibert-Blanton and her husband use the master bedroom and adjoining bathroom located on the second floor and Defendant and his girlfriend rent the other two bedrooms and a bathroom on the second floor. Defendant and his girlfriend use one of the bedrooms (where the evidence was found) and Defendant's children use the second bedroom rented by Defendant. The bathroom rented by Defendant is used only by Defendant, his girlfriend, and the children. Defendant and

7

his mother both testified Defendant's bedroom and bathroom doorknobs have "keyed locks" and that only Defendant and his girlfriend have keys to the locks.[6]

During Defendant's testimony, he admitted the residence appears to be a single family residence from the exterior. Defendant agreed the only visual indication the house contained separate dwelling units from the interior of the house was the keyed doorknobs. Defendant did not indicate his bedroom door was locked or closed at the time the police entered. Instead, it appears Defendant was coming out of his bedroom and the police did not allow him to go back in.

Both Defendant and his mother testified Defendant never used the kitchen in the house. Defendant admitted, however, that he had access to the kitchen and he obtained ice from the freezer in the kitchen on occasion. Defendant clearly used the hallways, stairs, and other common areas to enter and exit the house, as he had no separate entranceway. Defendant also testified that he had two small refrigerators in his bedroom and cooked at his girlfriend's grandmother's house or ate out. Also according to Defendant and his mother, other residents were not allowed in Defendant's bedroom (and bathroom) without Defendant's permission. Defendant testified that he locked the door to his bedroom and bathroom when he and his girlfriend were away from the house.

Elliott testified law enforcement found the package that Hutchison had delivered laying in the yard with the initials "RTS" (return to sender) handwritten on it. Although the parties dispute where the package was in the yard and when it was put there, Defendant admitted that he wrote RTS on the package after Sean said he was not expecting a package. Defendant set the

---

[6] While neither side placed a picture of the "keyed lock" into evidence, one was shown to a witness during the hearing and it appeared to be a normal exterior doorknob with a lock that would require a key to open from the outside if locked.

8

package in the yard because he knew co-defendant Joseph Martin was not supposed to mail a package to Sean. During cross-examination, Defendant initially testified he did not know the package contained marijuana, but when confronted with questions about text messages to the contrary, he admitted he did know the package contained marijuana.

**II.    ANALYSIS**

Defendant contends the execution of the search warrant should have been limited to only the areas of the residence occupied by or accessible to Sean, not the separate rooms rented by Defendant and his girlfriend. The contested issue presented is whether law enforcement officers knew or should have known the residence contained multiple, separate dwelling units and that Defendant's bedroom was not covered by the search warrant during the execution of the warrant. The government did not present testimony from any of the officers present during the initial execution of the warrant.[7]

A court is given wide latitude in making its credibility determinations. *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002). In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic. *See United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005). After considering each witness's demeanor, descriptive account of the events, and overall impression, I **FIND** both Hutchinson and Elliott gave credible testimony regarding those matters within their knowledge.

Neither officer, however, was present when Sibert-Blanton claims she told the executing officers about the rented rooms within her house. The only two witnesses to testify about that

---

[7] Neither Hutchison nor Elliott were present when the officers first entered the residence to remove the occupants. The Government did not present evidence from the officers who had the initial contact with Defendant and Sibert-Blanton during the execution of the warrant. As noted herein, Hutchison was not present for any of the execution of the search and Elliott dropped off the warrant, left to deliver another warrant, and then returned to the residence and was shown the evidence already located in Defendant's upstairs bedroom.

9

encounter were Defendant and Sibert-Blanton. Defendant's testimony is certainly not fully credible. For example, he initially falsely testified he did not know there was marijuana in the mailed package. The government argues Sibert-Blanton is likewise not credible because it is unlikely her son never used the kitchen in all the years he lived in the house as she claims, but it offered absolutely no evidence to refute that she told the police that Sean rented a room downstairs and Defendant rented rooms upstairs. While certain aspects of Sibert-Blanton's testimony seem unlikely or exaggerated, given that the Government chose not to present the testimony of the officers actually executing the warrant, I **FIND** there is no evidence to contradict Sibert-Blanton's testimony concerning what she said to the police about the room rentals.

A. **Search of Defendant's Living Quarters**

Defendant contends that because his mother advised the police that different people rented rooms in the house and because the police could see some of the bedrooms doors, including his, had doorknobs with "keyed locks," the police knew or should have known the warrant did not cover areas not rented or used by Sean, such as Defendant's bedroom. Because of this alleged improper execution of the warrant, Defendant argues all evidence located in his bedroom must be suppressed. The government argues the search warrant was both properly issued and executed as to the search of the entire house.

"[T]he Fourth Amendment confines an officer executing a search warrant strictly within the bounds set by the warrant." *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 394 n.7 (1971). If the scope of a search "exceeds that permitted by the terms of a validly issued warrant," the subsequent seizure of the items discovered is unconstitutional. *Horton v. California*, 496 U.S. 128, 140, (1990). "[T]he *context* of the search

10

determines the *scope* of the search." *United States v. Popham,* 250 F. App'x 170, 174 (6th Cir. 2007) (emphasis in original) (rejecting defendant's argument that the search of three greenhouses and a residence did not conform to the warrant, which referenced only one greenhouse).

Quite recently, the Sixth Circuit summarized the law as follows:

> As a general rule, "[a] warrant describing an entire building when cause is shown for searching only one apartment is void." *United States v. Votteller*, 544 F.2d 1355, 1363 (6th Cir. 1976). "[W]hen the structure under suspicion is divided into more than one occupancy unit, probable cause must exist for each unit to be searched." *United States v. Shamaeizadeh*, 80 F.3d 1131, 1137 (6th Cir. 1996) (internal quotation marks omitted). When a warrant is obtained for an entire structure, it is invalid if law enforcement "had known, or should have known," that the location was divided into separate units. *Maryland v. Garrison*, 480 U.S. 79, 85–86, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). Furthermore, law enforcement officers are "required to discontinue [a] search . . . as soon as they discover[]" that a location is in fact subdivided into separate dwelling units, especially if it is unclear which unit belongs to the subject of the warrant. *Id*. at 87, 107 S.Ct. 1013. "[T]he validity of the search . . . depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." *Id*. at 88, 107 S.Ct. 1013.

*United States v. Crumpton*, __ F.3d __, Nos. 15-1299/1560, 2016 WL 3093346, at *10 (6th Cir. June 2, 2016).[8]

Applying the reasoning of *Garrison*, *Votteller*, and *Shamaeizadeh*, the Sixth Circuit in *Crumpton* found little evidence to suggest the government could have known prior to the search

---

[8] In *Votteller*, the Sixth Circuit held, "[f]or the purposes of satisfying the Fourth Amendment, searching two or more apartments in the same building is no different than searching two or more completely separate houses." 544 F.2d at 1363 (quoting *United v. Hinton*, 219 F.2d 324, 325-26 (7th Cir. 1955)). In *Shamaeizadeh*, the Sixth Circuit held "when the structure under suspicion is divided into more than one occupancy unit, probable cause must exist for each unit to the searched." 80 F.3d at 1137 (quoting *United States v. Whitney*, 633 F.2d 902, 907 (9th Cir. 1981)). In *Garrison*, the Court found two separate constitutional issues arise in situations involving multiple residences in a single building: "one concerning the validity of the warrant and the other concerning the reasonableness of the manner in which it was executed." 480 U.S. at 84.

11

that the residence was subdivided because the investigation did not reveal the existence of subdivided apartments. *Id.* at *11. The same conclusion is reached here. As there was nothing to suggest the residence was subdivided into separate dwelling units prior to the execution of the search warrant, the warrant was validly issued and Defendant has not argued otherwise.

The issue at hand is whether in *executing* the warrant, the officer's search of Defendant's bedroom was a flagrant disregard of the limitations of the warrant. *See Brindley v. Best,* 192 F.3d 525, 531 (6th Cir. 1999) (citing *United States v. Lambert,* 771 F.2d 83, 93 (6th Cir. 1985)). "The test for making such a determination is whether the officer's actions were reasonable." *United States v. King*, 227 F.3d 732, 751 (6th Cir. 2000) (citing *Brindley,* 192 F.3d at 531).

With respect to the question of what the officers would have learned upon executing the warrant, the court in *Crumpton* found the "lack of indicia that the house included any separate living areas, along with the suggestion that [the defendant] used the front and back areas of the house, renders the government's belief that the house was a single residence reasonable." 2016 WL 3093346, at *11. As held in *Garrison*, "the validity of the search of [a separate dwelling unit] pursuant to a warrant authorizing the search of the entire [building] depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." 480 U.S. at 88 (citing *Hill v. California*, 401 U.S. 797, 803-04 (1971)). An officer's actions in searching what turns out to be a separate dwelling unit is reasonable if the objective facts available to the officer at the time of the execution of the search warrant suggests no distinction between the separate dwelling unit and the rest of the premises. *Id.*

In this case, there was no evidence presented of any visible indication from the exterior of the house that there were separate dwelling spaces within. The postal address did not indicate multiple separate units and there was only one mailbox and one front door. In short, nothing

about the house's outward appearance indicated it contained separate dwelling units.[9] *See Crumpton*, 2016 WL 3093346, at *10-11 (finding no outward indication of subdivided apartments where it appeared to be a single-family home from the outside and, while there were multiple mailboxes, their visibility was questionable, as was the presence of any apartment numbers); *United States v. Noel*, 938 F.2d 685, 686 (6th Cir. 1991) (finding no outward indication the residence was anything but a single-family dwelling where there were two rear apartments that "had no exterior designations or identifying addresses, nor were they equipped with separate mailboxes").

Moreover, there was scant evidence presented of any visible indication from the interior of the house of dwelling separateness, such as a locked door separating the upstairs from the downstairs. The only arguably visible sign of any limitation of access to the various bedrooms in the house was a keyed lock on some, but not all, of the bedrooms doors, including the doorknob of the open door to Defendant's bedroom. Although Defendant points to the existence of a keyed lock on his bedroom door as evidence of separate dwellings, it is undisputed that the door to Defendant's bedroom was open and unlocked at the time police made their initial entry. While Defendant did have two small refrigerators in his bedroom, there was not a kitchen, den, or other living space contained within his room.

This situation is far different from others where courts have determined officers knew or should have known a structure contained multiple dwelling units. For instance, in *Shamaeizadeh*, the court found police officers knew or should have known the residence was

---

[9] There is also no indication in the search warrant and its description of the residence that would give officers any indication there were separate living quarters within the dwelling as it describes the property as "located at [redacted] East Lauderdale Street, Tullahoma, TN. This will be a two-story residence with yellow siding and white trim. This house number [redacted] will be clearly marked to the right of the front door of residence." [Doc. 139-1].

13

comprised of two dwellings because there was a locked door separating the upper floor and the basement floor, there was evidence of separate living quarters such as a den and a refrigerator in the basement apartment, there was an exterior door to access the basement apartment, and the occupant of the upstairs apartment told the police that her access to the basement apartment was restricted. 80 F.3d at 1138-39.

Defendant's main argument is that the police actually knew the warrant was overbroad because Sibert-Blanton told the police about the room rentals. Defendant quotes *United States v. McLellan*, 792 F.3d 200, 212 (1st Cir. 2015) as holding "the general rule is that a warrant that authorizes the search of an undisclosed multi-unit dwelling is invalid." [Doc 166 at Page ID # 839]. However, *McLellan* also states: "Whether a dwelling constitutes a single- or multi-unit residence is a fact-intensive and situation-specific determination, and thus there are no hard-and-fast rules as to what category any particular dwelling falls into." 792 F.3d at 212. Defendant has not cited any cases (and none have been found) where evidence was suppressed on the basis that a family member told an executing officer that other family members rented rooms but there was no physical indication of separateness other than an unlocked door with a keyed lock.

The government cites to *United States v. Jackson*, 508 F. Supp. 2d 422, 429 (M.D. Pa. 2007) to support its proposition that the multi-dwelling rule of *Garrison* is inapplicable to the instant matter. In *Jackson*, the court determined that despite Jackson's locked bedroom door nothing signaled the police executing a search warrant that the room constituted a separate dwelling. *Jackson* can be distinguished, however, because the police were not advised that Jackson's bedroom was a separate dwelling until *after* it was searched. Here, however, no evidence has been presented to dispute that the police were specifically advised prior to the

14

search that Sean rented a downstairs bedroom in the single-family residence, and Defendant rented rooms upstairs.

It is questionable whether the residence actually contains multiple, separate rental units given the facts of this case. Nevertheless, and even assuming there were multiple separately rented rooms in the residence, I **FIND** nothing about the appearance of the house, including the keyed lock doorknobs, would have put the officers on notice that the house contained separate dwelling units making the warrant overbroad. However, the Court must still consider the impact of what the officers were told by Sibert-Blanton.

Accepting at face value that Sibert-Blanton informed the police of her sons' rental arrangements, I **FIND** the evidence of what she alone told the officers is insufficient to render execution of the warrant unconstitutional. Even if her sons paid rent for bedrooms/bathrooms in the house, Sibert-Blanton did not inform the officers that there were any restrictions on any of the occupants' use of the house. While there was testimony that Defendant did not actually use the common kitchen other than to occasionally get ice, there was no evidence that he was restricted from doing so. There was also no evidence Sean was restricted from using any common areas. Significantly, the police executing the warrant were not told by Sibert-Blanton that either of her son's access to other areas of the house, including each son's bedroom, was in

15

any way restricted.[10] Defendant chose to remain silent and made no protest about the search of his bedroom and made no claim that Sean had no access to Defendant's bedroom.

With respect to the execution of a validly issued warrant such as the one in this case, the Court in *Garrison* stated: "While the purposes justifying a police search strictly limit the permissible extent of the search, the Court has also recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." 480 U.S. at 87. Given that there was no obvious exterior or interior indication the house was subdivided and, at best, only Sibert-Blanton mentioned the rental rooms without noting any restrictions on access, I **FIND** the officers' failure to realize any overbreadth of the warrant was objectively understandable and reasonable.

A person aggrieved by a search and seizure has the burden of production and persuasion to suppress evidence. *United States v. Smith,* 783 F.2d 648, 650 (6th Cir. 1986). Defendant has not met that burden here as he has not shown the search warrant was improperly executed or that a reasonable officer would believe the search was proceeding beyond the scope of the warrant merely because his mother informed the police that her sons rented separate rooms within the house. Therefore, I **FIND** the search warrant was properly executed and the search of Defendant's bedroom was reasonable. *See United States v. Pule*, No. 4:11-CR-37, 2012 WL

---

[10] The Sixth Circuit has recognized a single unit exception. *See United States v. Gonzalez*, 697 F.2d 155 (6th Cir. 1983). In *Gonzalez*, the Sixth Circuit held there is a generally recognized exception to the general rule that probable cause must exist for the search of each unit of a structure which is divided into multiple units, in a situation where "a building, although subdivided, is actually being used as one unit." *Id*. at 155 (citing *United States v. Whitney*, 633 F.2d 902 (9th Cir. 1980), *cert. denied*, 450 U.S. 1004 (1981)). *See also Votteller*, 544 F.2d at 1363 ("probable cause must be shown for searching each residence unless it be shown that, although appearing to be a building of several apartments, the entire building is actually being used as single unit"); *United States v. Olt*, 492 F.2d 910, 911 (6th Cir. 1974) (same).

16

6760630, at *7 (E.D. Tenn. July 5, 2012), *report and recommendation adopted,* No. 4:11-CR-37, 2013 WL 30219 (E.D. Tenn. Jan. 2, 2013).

### B. Government's Alternative Arguments

Because the motion to suppress fails on the grounds addressed above, it is not necessary to address the government's alternative arguments, including its "good faith" argument.

### III. CONCLUSION

For the reasons stated above, I **RECOMMEND**[11] that Defendant's motion to suppress [Doc. 130] be **DENIED**.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[11] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).