# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 4:15-cr-18 |
| v. | ) | |
| | ) | Judge Travis R. McDonough |
| MICHAEL SIBERT | ) | |
| | ) | Magistrate Judge Susan K. Lee |
| | ) | |

## MEMORANDUM OPINION

Defendant filed a motion to suppress evidence obtained during a search pursuant to a search warrant. (Doc. 130.) Magistrate Judge Susan Lee held a hearing on the motion and filed a report and recommendation ("R&R") recommending that the Court deny the motion to suppress (Doc. 172). Defendant timely objected (Doc. 177), and the Government responded (Doc. 186). For the reasons set forth below, the Court will **ACCEPT** and **ADOPT** the R&R and will **DENY** Defendant's motion to suppress (Doc. 172).

## I.    BACKGROUND

Defendant and several codefendants have been charged in a five-count indictment with conspiring to distribute 100 kilograms or more of a mixture and substance containing marijuana and with using the United States mail to facilitate the conspiracy. (Doc. 3.) The charges stem from an investigation conducted by the Jedidiah Hutchison of the United States Postal Inspection Service and Officer Thomas Elliott of the Tullahoma Police Department regarding suspicious packages that were being mailed through the Postal Service from Eureka, California to Tullahoma, Tennessee.

Inspector Hutchison identified several of the suspicious packages and acquired warrants

to open those packages. One of those packages was addressed to Sean Blanton, the Defendant's

half-brother. Upon executing the warrants, Hutchison found that the package contained

approximately two pounds of marijuana. Inspector Hutchison then performed a controlled

delivery of the package to the address listed on the package and confirmed that the package was

signed for by a family member and taken inside the home. Though Defendant contests the claim,

Inspector Hutchison claims that during the controlled delivery he saw the Defendant inside the

home hiding behind the door. After performing the controlled delivery, Inspector Hutchison

relayed confirmation of the delivery to Officer Elliott, who was not at the residence, who then

obtained a search warrant for the address listed on the package.

The warrant describes the property to be searched as

> the person of said Sean Blanton and in the premises used and occupied by him (her
> or them) . . . located at [redacted] Easter Lauderdale Street, Tullahoma, TN. This
> will be a two-story residence with yellow siding and white trim. This house number
> [redacted] will be clearly marked to the right of the front door of residence. This is
> the premises to be searched including all of the buildings, out-houses and vehicles
> found thereof . . . .

(*Id.*)

Law enforcement officials executed the search warrant on July 29, 2015. (Doc. 139-1, at

3.) Though the facts surrounding the execution of the warrant are somewhat in dispute, the

Magistrate Judge's R&R provides a concise summary of the testimony.

> When Elliott arrived at the East Lauderdale Street house to deliver the executed
> search warrant, he noticed that Defendant and other occupants of the residence had
> already been detained outside the house. Elliott delivered the warrant and stayed
> about 20 minutes, but then left to deliver the other warrant obtained with respect
> to the attempted delivery of the second package. When he returned to the East
> Lauderdale Street residence some time later, several other police officers had
> already searched the entire house, including Defendant's bedroom on the second
> floor where the evidence at issue was found.[1]

---

[1] Items found in Defendant's room allegedly include a pistol, drug paraphernalia, a receipt book,
notebook ledgers, and cellular telephones.

Defendant testified that on the day at issue he and his mother were on the second floor of the residence when the police "swarmed" the house. As an officer walked up the stairway to the second floor of the residence, Sibert-Blanton came out of her bedroom and Defendant, who was "half-dressed" came out of his room. The unidentified officer told Defendant and his mother to go outside with the rest of the occupants.

Sibert-Blanton and Defendant both testified that before the execution of the warrant began, Sibert-Blanton asked why the police were inside her house. Specifically, Sibert-Blanton testified:

> Defendant's counsel: Okay. And how did you first become aware that the police were there?
>
> Sibert-Blanton: [after describing that she came out of her bedroom and took two or three steps down the stairs and met an officer coming up] And when I saw him, I said, who are you and why are you in my house.
>
> Defendant's counsel: Okay.
>
> Sibert-Blanton: And he asked me, are you the homeowner. And I said, yes, I am. And he said who else is in the upstairs with you. And I said Michael, Brittany and the kids are up here. They live up here in this area. This is the area they rent.
>
> Defendant's counsel: Okay.
>
> Sibert-Blanton: He said I need you to go downstairs right now. And I went downstairs. And I kept, I said what are you doing here, why are you in my house.
>
> Defendant's counsel: Okay:
>
> Sibert-Blanton: And another officer said, we have a search warrant for Sean Blanton. And I said, well, Sean Blanton's room is right there. That's where he lives. That's the room he rents.
>
> Defendant's counsel: Okay.
>
> Sibert-Blanton: And then they took me to the front porch.

[Doc. 156 at Page ID # 721-22].

Defendant testified he went downstairs as ordered by the police without incident. Defendant did not say anything about his bedroom or living space being separate to the police. Defendant testified that he remained silent because he heard his

mother telling the police about the rented rooms. Defendant did not lock the door to his room as his keys were left in the room and he was ordered downstairs.

Defendant testified that he had lived in his mother's house for about two years. Defendant said he began paying rent after his mother had issues with his brothers not working and she required them to either pay rent or move out. Defendant rented two upstairs bedrooms and a bathroom from his mother for $100.00 per month and [his brother Sean Blanton rented a room downstairs]. He described that his mother had required the adult children in her house to pay rent and that he had been paying rent for three-to-four months. He also described her house as being like a "boarding house."

All parties agree the police never sought consent to search any part of the house. Elliott testified that when he returned to the residence, an officer took him upstairs to see the evidence they had already located in Defendant's bedroom. Elliott testified that he also saw no door or other partition between the first and second floors or any other indication that there were separate apartments or units within the house. Elliott saw no padlock or other visible lock on the outside of Defendant's bedroom door. Elliott, who did not search the house, said he only saw one bathroom on the second floor of the house.

Sibert-Blanton testified her home has six bedrooms; three bedrooms are upstairs. Defendant and his mother both testified there were two bathrooms on the second floor, not one. Sibert-Blanton and her husband use the master bedroom and adjoining bathroom located on the second floor and Defendant and his girlfriend rent the other two bedrooms and a bathroom on the second floor. Defendant and his girlfriend use one of the bedrooms (where the evidence was found) and Defendant's children use the second bedroom rented by Defendant. The bathroom rented by Defendant is used only by Defendant, his girlfriend, and the children. Defendant and his mother both testified Defendant's bedroom and bathroom doorknobs have "keyed locks" and that only Defendant and his girlfriend have keys to the locks.[2]

During Defendant's testimony, he admitted the residence appears to be a single family residence from the exterior. Defendant agreed the only visual indication the house contained separate dwelling units from the interior of the house was the keyed doorknobs. Defendant did not indicate his bedroom door was locked or closed at the time the police entered. Instead, it appears Defendant was coming out of his bedroom and the police did not allow him to go back in.

Both Defendant and his mother testified Defendant never used the kitchen in the house. Defendant admitted, however, that he had access to the kitchen and obtained ice from the freezer in the kitchen on occasion. Defendant clearly used the hallways, stairs, and other common areas to enter and exit the house, as he had no separate entranceway. Defendant also testified that he had two small refrigerators in his bedroom and cooked at his girlfriend's grandmother's house or ate out. Also according to Defendant and his mother, other residents were not allowed in Defendant's bedroom (and bathroom) without Defendant's

---

[2] While neither side placed a picture of the "keyed lock" into evidence, one was shown to a witness during the hearing and it appeared to be a normal exterior doorknob with a lock that would require a key to open from the outside if locked.

permission. Defendant testified that he locked the door to his bedroom and bathroom when he and his girlfriend were away from the house.

Elliott testified law enforcement found the package that Hutchison had delivered laying in the yard with the initials "RTS" (return to sender) handwritten on it. Although the parties dispute where the package was in the yard and when it was put there, Defendant admitted that he wrote RTS on the package after Sean said he was not expecting a package. Defendant set the package in the yard because he knew co-defendant Joseph Martin was not supposed to mail a package to Sean. During cross-examination, Defendant initially testified he did not know the package contained marijuana, but when confronted with questions about text messages to the contrary, he admitted he did know the package contained marijuana.

(Doc. 172, at 5–9.)

Defendant's motion to suppress challenges the search warrant's execution and seeks to suppress evidence found as a result of the search. (Doc. 130.) Defendant contends that because the search warrant listed "Sean Blanton" as its subject, the execution of the search warrant should have been limited to the areas of the residence that were rented or used by Blanton and that the police unlawfully extended the search to Defendant's separately rented rooms. (*Id.*)

## II.     STANDARD OF REVIEW

This Court must conduct a *de novo* review of those portions of the R&R to which objections are made. 28 U.S.C. § 636(b)(1)(C). But *de novo* review does not require the district court to rehear witnesses whose testimony has been evaluated by the Magistrate Judge. *See United States v. Raddatz*, 447 U.S. 667, 675–76 (1980). The Magistrate Judge, as the factfinder, had the opportunity to observe and hear the witnesses and assess their demeanor, putting her in the best position to determine credibility. *Moss v. Hofbauer*, 286 F.3d 851, 868 (6th Cir. 2002); *United States v. Hill*, 195 F.3d 258, 264–65 (6th Cir. 1999). The Magistrate Judge's assessment of witnesses' testimony is therefore entitled to deference. *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003).

### III.    ANALYSIS

Defendant objects to Magistrate Judge Lee's recommendation that the evidence found during search of the residence not be suppressed by arguing that the search violated his Fourth Amendment rights. He argues he exhibited a reasonable expectation of privacy in the rooms he rented in his mother's home and the officers executing the search warrant should have investigated further before searching his room after being told that the room was a separate residence.

The Fourth Amendment protects "people from unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Reed*, 141 F.3d 644, 648 (6th Cir. 1998); *see also* U.S. Const. amend. IV. "[T]he Fourth Amendment confines an officer executing a search warrant strictly within the bounds set by the warrant." *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 394 n. 7 (1971). In deciding whether execution of a warrant violates a citizen's Fourth Amendment protections, courts are to focus "on the conduct of a reasonable officer and the reasonableness of his belief as to whether the search at issue is proceeding beyond the four corners of the warrant." *See United States v. Ritter*, 416 F.3d 256, 266 (3d Cir. 2005) (referencing *Maryland v. Garrison*, 480 U.S. 79 (1987).)

The issue at hand is whether the officers' search of Defendant's bedroom was a flagrant disregard for the limitations of the search warrant. *See Brindley v. Best*, 192 F.3d 525, 531 (6th Cir. 1999) (citing *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985).) "The test for making such a determination is whether the [officers'] actions were reasonable." *United States v. King*, 227 F.3d 732, 751 (citing *Brindley*, 192 F.3d at 531).) As the Magistrate Judge correctly pointed out, the evidence indicates that the officers' actions in searching Defendant's bedrooms were reasonable given the lack of evidence suggesting there were separate residences.

There is no evidence of any visible indication on the exterior of the home that there were separate dwelling units at the home. Both Inspector Hutchison and Officer Elliott testified that their preliminary investigations of the residence prior to seeking a search warrant indicated that the home was a single-family residence. (Doc. 156, at 10, 22–23.) Inspector Hutchison pointed out that the home has only one mailbox and *appears* to passersby as having only entrance. (*Id.* at 10.) Additionally, there is no evidence to suggest that there are separate exits, separate doorbells, separate utilities, or any other remarkable indicia on the exterior that would indicate separate and distinct dwelling units.

Similarly, there is little evidence to suggest there were any visible indicia of separate dwelling units on the interior of the home. Defendant's door was unlocked and open when the officers executed the warrant. The home is laid out, and operates like, a single family residence. Defendant's bedroom is accessed through a common, interior hallway with no other entryway. Defendant's bedroom has no markings that distinguish it as a separate dwelling unit. And, although Defendant claims to rent two bedrooms—one for himself and one for his children— only one of those bedrooms has a lock on it. Defendant and his family members shared common living spaces, such as the living room or kitchen, with the exception of enjoying dedicated bathrooms. (Doc. 156, at 42 (Defendant admits to having access to the common kitchen and also admits to using the kitchen at least occasionally to retrieve ice.).)

The officers did not exhibit a flagrant disregard for the scope of the warrant. As the Magistrate Judge pointed out, Defendant has cited no case law to establish that suppression of evidence is proper on the basis that a family member told officers that other family members were renting rooms in a home where there was no indication of separateness in the home. (Doc. 172, at 14.) There was ample evidence from which a reasonable officer could have concluded

that searching Defendant's bedroom was within the confines of the search warrant. Therefore, the Court will **ACCEPT** and **ADOPT** the Magistrate Judge's R&R (Doc. 172) and **DENY** the motion to suppress (Doc. 130).

## IV. CONCLUSION

For the foregoing reasons, the Court will **ACCEPT** and **ADOPT** the Magistrate Judge's R&R (Doc. 172) and **DENY** the motion to suppress (Doc. 130). A separate order will enter resetting the schedule in this case.

**SO ORDERED**.

*/s/Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**